No. 11-5963

# In The United States Court of Appeals
# For The Sixth Circuit

---

LEONARD EMBODY,

Plaintiff-Appellant,

v.

STEVE WARD,

Defendant-Appellee.

---

Appeal from a Judgment of the United States District Court
for the Middle District of Tennessee
The Hon. William J. Haynes, Jr.
(3:10-CV-0126)

---

**BRIEF OF SECOND AMENDMENT FOUNDATION, INC.,
AND THE CALGUNS FOUNDATION, INC., AS *AMICI CURIAE*
IN SUPPORT OF APPELLEE SEEKING AFFIRMANCE**

---

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665
alan@gurapossessky.com

December 5, 2011        *Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 11-5963                              Case Name: Leonard Embody v. Steve Ward

Name of counsel: Alan Gura

Pursuant to 6th Cir. R. 26.1, The Calguns Foundation, Inc.

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

CERTIFICATE OF SERVICE

I certify that on _____ December 5, 2011 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Alan Gura

Counsel for Amicus The Calguns
Foundation, Inc.

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 11-5963                     Case Name: Leonard Embody v. Steve Ward

Name of counsel: Alan Gura

Pursuant to 6th Cir. R. 26.1, Second Amendment Foundation, Inc.
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

CERTIFICATE OF SERVICE

I certify that on _____ December 5, 2011 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Alan Gura

Counsel for Amicus Second

Amendment Foundation, Inc.

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Interests of *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Consent to File. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY
        ARMS IN PUBLIC FOR SELF-DEFENSE.. . . . . . . . . . . . . . . . . . . 4

        A.    THE RIGHT TO BEAR ARMS IS NOT LIMITED
              TO THE HOME.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    *HELLER*'S INTERPRETATION OF "BEAR ARMS"
              BINDS THIS COURT . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    II.    WHILE THE SECOND AMENDMENT PROTECTS THE
        POSSESSION AND USE OF PLAINTIFF'S ARM, IT DOES
        NOT PROTECT PLAINTIFF'S DANGEROUS AND UNUSUAL
        USE OF HIS ARM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## Cases

*Adamson* v. *California*,
  332 U.S. 46 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Andrews* v. *State*,
  50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15, 16

*Aymette* v. *State*,
  21 Tenn. 154 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Baraket* v. *Holder*,
  632 F.3d 56 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Boardley* v. *United States Dept. of Interior*,
  615 F.3d 508 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*City of Las Vegas* v. *Moberg*,
  485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . . . . . . . . . . . 10

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*English* v. *State*,
  35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ezell* v. *City of Chicago*,
  651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

*Gonzalez* v. *Vill. of W. Milwaukee*,
  2010 U.S. Dist. LEXIS 46281 (D. Wis. May 11, 2010) . . . . . . 17, 18

*Hormel Foods Corp.* v. *Jim Henson Prods.*,
  73 F.3d 497 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*In re Application of McIntyre*,
    552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Brickey*,
    70 P. 609 (Idaho 1902) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Johnson* v. *Eisentrager*,
    339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kellogg* v. *City of Gary*,
    562 N.E.2d 685 (Ind. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Malloy* v. *Hogan*,
    378 U.S. 1 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 11

*Muscarello* v. *United States*,
    524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Myers* v. *United States*,
    272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Nordyke* v. *King*,
    2011 U.S. App. LEXIS 23703 (9th Cir. Nov. 28, 2011). . . . . . . . . . 5

*Nordyke* v. *King*,
    563 F.3d 439, *vacated*, 575 F.3d 890 (9th Cir. 2009). . . . . . . . . . . 5

*Nunn* v. *State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Owen* v. *State,*
 31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*O'Neill* v. *State,*
 16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Parker* v. *District of Columbia,*
 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Peruta* v. *County of San Diego,*
 678 F. Supp. 2d 1046 (S.D. Cal. 2010).. . . . . . . . . . . . . . . . . . . . . 12

*Peruta* v. *County of San Diego,*
 758 F. Supp. 2d 1106 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . 14

*Rex* v. *Knight,*
 90 Eng. Rep. 330 (K.B. 1686).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Robertson* v. *Baldwin,*
 165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sanborn* v. *Parker,*
 629 F.3d 554 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sarnoff* v. *Am. Home Prods. Corp.,*
 798 F.2d 1075 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Scott* v. *Sandford,*
 60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Seminole Tribe of Fla.* v. *Florida,*
 517 U.S. 44 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State ex rel. City of Princeton* v. *Buckner,*
 377 S.E.2d 139 (W. Va. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State* v. *Rosenthal*,
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State* v. *Delgado*,
    692 P.2d 610 (Or. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State* v. *Jumel*,
    13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State* v. *Kerner*,
    107 S.E. 222 (N.C. 1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State* v. *Langford*,
    10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State* v. *Lanier*,
    71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State* v. *Reid*,
    1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Bloom*,
    149 F.3d 649 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Masciandaro*,
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States* v. *Miller*,
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States* v. *Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . . . . 13

## Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const. amend. VI.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Statutes

15 U.S.C. § 5001(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.C. Code § 22-4504(a) (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wis. Stat. § 175.60.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Other Authorities

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . 9

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
IN FORCE IN KENTUCKY (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

David Caplan, *The Right of the Individual to Bear Arms:
A Recent Judicial Trend*, 4 DET. L. C. REV. 789 (1982) . . . . . . . . 24

Eugene Volokh, *Implementing the Right to Keep
and Bear Arms for Self-Defense: An Analytic
Framework and a Research Agenda*,
56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

James Wilson, WORKS OF THE HONOURABLE
    JAMES WILSON (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . 25

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . 25

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS:
    THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . 24

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed. 1884). . . . . . . . . 17

TREATISE ON THE PLEAS OF THE CROWN, (Leach ed., 6th ed. 1788). . . . 24

William Blackstone, COMMENTARIES ON THE
    LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

William Oldnall Russell, A TREATISE ON CRIMES AND
    INDICTABLE MISDEMEANORS (1826). . . . . . . . . . . . . . . . . . . . 25, 26

"Border Concerns," available at http://www.nps.gov/
        orpi/planyourvisit/boarder-concerns.htm
        (last visited December 5, 2011). . . . . . . . . . . . . . . . . . . . . . . . 19

## INTERESTS OF *AMICI CURIAE*[1]

*Amicus Curiae* Second Amendment Foundation, Inc. ("SAF"), a non-profit educational foundation, seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing in every State of the Union. SAF organized, and prevailed, in Second Amendment landmarks *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010) and *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011).

*Amicus Curiae* The Calguns Foundation, Inc. ("Calguns"), is a non-profit organization incorporated under the laws of California with its principal place of business in San Carlos, California. The purposes of Calguns include supporting the California firearms community by promoting education for all stakeholders about California and federal firearm laws, rights and privileges; and defending and protecting the civil rights of California gun owners.

_____

[1]No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person other than *amici*, their members, and counsel, contributed money intended to fund preparation and submission of this brief.

1

The Court's decision here could directly impact the individual and organizational *amici*, as well as SAF and Calguns' members and supporters, who enjoy exercising Second Amendment rights. SAF and Calguns have substantial expertise in the field of Second Amendment rights that would aid the Court.

CONSENT TO FILE

All parties have consented to the filing of this brief.

INTRODUCTION

The Second Amendment secures the right of responsible, law-abiding individuals to publicly carry handguns for self-defense—including in public parks. But the Second Amendment does not support a right to deliberately alarm people with firearms, to disguise firearms as toys, or to initiate confrontations with police.

In an appropriate case, *amici* could demonstrate that Americans enjoy Second Amendment rights in ordinary civilian versions of the AK-47, an arm in common use today for traditional lawful purposes. But for purposes of this case, it is enough to note that the American public, and the police and judiciary which serve it, are not expected to tolerate men in camouflage walking about nature sanctuaries with

2

orange-tipped AK-47s disguised as toys, complete with 30 round "banana" magazines, slung across their chests. Plaintiff's intentionally provocative conduct in no way represents the manner in which millions of Americans responsibly and effectively exercise their right to bear arms every day. Plaintiff should be grateful for what he conceded was the police's calm, courteous and respectful professionalism in dealing with his behavior. Embody Deposition, R. 16-1, at 63, l. 18-64, l. 15.

Plaintiff might well have posed a threat to others at Radnor Lake State Park. But his ill-advised, if not actually frivolous litigation proved conclusively to jeopardize the security of Second Amendment rights, prompting the District Court to issue an opinion reaching the correct result only by erroneously limiting the scope of the right to keep and bear arms.[2]

*Amici* seek to inform the Court that the right to bear arms applies in public parks. The decision below should be affirmed, however, because the right does not encompass Plaintiff's extraordinary conduct.

---

[2]Traditionally, strategic civil rights litigation seeks to present sympathetic scenarios near or within the consensus of the right sought to be advanced—not atypical or outrageous conduct that is, at best, only arguably within the scope of the relevant right.

SUMMARY OF ARGUMENT

The District Court correctly noted that this case does not present the question of whether Plaintiff's firearm qualifies for Second Amendment protection. Memorandum Opinion, R. 43, at 17 n.5. Yet the District Court misread *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), in suggesting that the right to bear arms does not apply outside the home, or in public parks. Per *Heller*, it does.

However, as *Heller* also makes clear, the right to bear arms does not protect the carrying of "dangerous and unusual" weapons, *Heller*, 554 U.S. at 626, a doctrine that refers not to types of arms, but to their misuse in terrorizing the public. Plaintiff's successful use of his firearm to alarm people and deliberately precipitate a police confrontation belies any claim to Second Amendment protection for his conduct.

ARGUMENT

I. THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY ARMS IN PUBLIC FOR SELF-DEFENSE.

The District Court read *Heller* as limited to its facts, referencing as the case's "express holding," R. 43, at 15, the Supreme Court's instruction that the District of Columbia "must issue [Heller] a license

to carry [his handgun] in the home." *Heller*, 554 U.S. at 635. The court further invoked the Fourth Circuit's reticence to decide whether the Second Amendment is operative in public parks, R. 43, at 15 (citing *United States* v. *Masciandaro*, 638 F.3d 458 (4th Cir. 2011)), the Fourth Circuit's suggestion that the right may not apply in parks, R. 43, at 16 (citing *Masciandaro)*, and the Ninth Circuit's long-vacated opinion suggesting that a ban on the sale of guns on county property may not violate the Second Amendment. R. 43, at 16-17 (citing *Nordyke* v. *King*, 563 F.3d 439, *vacated*, 575 F.3d 890 (9th Cir. 2009)).[3]

The District Court's location of *Heller*'s holding is plainly erroneous. *Heller* "*held* that the Second Amendment protects the right to keep and bear arms for self-defense." *McDonald*, 130 S. Ct. at 3026 (emphasis added); *id.* at 3059 (Thomas, J., concurring in part and concurring in judgment). The reference to Heller's permit to carry a gun inside his

---

[3]Plaintiff noted *Nordyke* was "severely criticized," Appellants' Br. 9 (citation omitted), but not that it was vacated. Moreover, the criticism referenced by Plaintiff attacked *Nordyke* on the one issue the Ninth Circuit got right, and for which the criticizing case was reversed by the Supreme Court: the Second Amendment's application to the states. Presumably, this is a point with which Plaintiff agrees. In any event, *Nordyke* is now again pending before the Ninth Circuit en banc. *Nordyke* v. *King*, 2011 U.S. App. LEXIS 23703 (9th Cir. Nov. 28, 2011).

home must be understood in its context. Heller challenged, among other provisions, former D.C. Code § 22-4504(a) (2008), that had provided that the carrying of handguns inside one's home without a permit constituted a misdemeanor offense. Heller did not seek a permit to carry a handgun in public. *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*. The reference to an in-home carry permit merely tracked Heller's prayer for relief. *Heller*, 554 U.S. at 630-31.

An examination of *Heller*, and of the right it secured, reveals that individuals generally enjoy a right to carry guns for self-defense.

A.    THE RIGHT TO BEAR ARMS IS NOT LIMITED TO THE HOME.

The Second Amendment protects the right "to keep and bear arms." U.S. Const. amend. II. This syntax is not unique within the Bill of Rights. Just as the guarantee of a "speedy and public trial," U.S. Const. amend. VI, does not sanction secret, speedy trials or public, slow trials; and just as the proscription against "cruel and unusual" punishment, U.S. Const. amend. VIII, does not allow for the usual practice of torture, the Second Amendment's reference to "keep and bear" refers to two distinct concepts. "It cannot be presumed that any clause in the

constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

The Supreme Court has always accepted that the Second Amendment's guarantee extends beyond the threshold of one's home. As early as 1857, the infamous *Dred Scott* case reasoned that no Southern state would have adopted a constitution obligating it to respect privileges and immunities of citizenship held by African-Americans, including "the full liberty . . . to keep and carry arms wherever they went." *Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857) (emphasis added).

While *Scott*'s odious holding was never correct, the opinion's recognition of the fact that citizens enjoy a personal right carry arms was no aberration. Nearly a century later, the Supreme Court observed that "during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could [not] require the American

Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

Indeed, the Supreme Court's first foray into Second Amendment law centered around the question of whether individuals had the right to transport a sawed-off shotgun between Claremore, Oklahoma and Siloam Springs, Arkansas—plainly, an activity that took place outside the home. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). Whatever else it might have held, *Miller* indicated that the Second Amendment has operative relevance on the highways.

Nearly seventy years later, the Supreme Court held that the Second Amendment's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576. After all, "an amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption, . . . For it was for public adoption that it was proposed.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J., concurring) (citation omitted), *overruled on other grounds by Malloy* v. *Hogan*, 378 U.S. 1 (1964). Rejecting an argument that the term "bear

8

arms" indicates an exclusively military undertaking, the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

> To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."

*Id*. (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)). Accordingly, the Court repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep and carry arms." *Heller*, 554 U.S. at 604; *id*. at 626.

Having defined the Second Amendment's language as including a right to "carry" guns for self-defense, the Court helpfully noted several exceptions that prove the rule. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *Heller*, 554 U.S. at 627

n.26, "laws forbidding the carrying of firearms in sensitive places," *id.* at 626, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are not presumptively lawful in non-sensitive places.

In upholding the right to carry a handgun under the Second Amendment, *Heller* broke no new ground. As early as 1846, Georgia's Supreme Court, applying the Second Amendment, quashed an indictment for the carrying of a handgun that failed to allege whether the handgun was being carried in a particular manner. *Nunn* v. *State*, 1 Ga. 243, 251 (1846); *see also In re Brickey*, 70 P. 609 (Idaho 1902) (Second Amendment right to carry handgun). Numerous state constitutional right to arms provision have likewise been interpreted as securing the right to carry a gun in public, albeit often, to be sure, subject to some regulation. *See, e.g. Kellogg* v. *City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton* v. *Buckner*, 377 S.E.2d 139 (W. Va. 1988); *City of Las Vegas* v. *Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971); *State* v. *Kerner*, 107 S.E. 222 (N.C. 1921); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (striking down ban on concealed carry);

10

*Andrews* v. *State*, 50 Tenn. 165 (1871); *see also State* v. *Delgado*, 692 P.2d 610 (Or. 1984) (right to carry a switchblade knife).

Indeed, the Supreme Court extolled various traditional outdoor firearms activities. The right was valued "for self-defense *and hunting*." *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. "No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it*, and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (citation omitted) (emphasis added). Hunting and target practice, at least with firearms, are activities not typically pursued at home.

Even Justice Stevens foresaw the Second Amendment's application beyond the home:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting); *see also id.* at 677

n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting).[4]

Courts sometimes do acknowledge that "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010). For example, the Seventh Circuit applied the right to keep and bear arms outside the home, enjoining Chicago's ban on the operation of gun ranges by recognizing a Second Amendment right to practice shooting. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell*, 651 F.3d at 704.

It would not be logical to seize upon the Supreme Court's mere description of the laws struck down in *Heller*, "[w]e hold that the District's ban on handgun possession in the home [and] its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense," *Heller*, 554 U.S. at 635, to limit the

---

[4]Justice Stevens offered that the Amendment "*does* encompass the right to use weapons for certain military purposes," *Heller*, 554 U.S. at 636 (Stevens, J., dissenting), presumably, outside the home.

right's application to only those circumstances. The Court's sixty-six pages of reasoning indeed contain guidance for the lower courts; writing them was not a superfluous exercise adding nothing to what could have been a one-sentence opinion. As the Seventh Circuit observed:

> the Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open.

*United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis added).

Fully consistent with the right to bear arms, states have traditionally been allowed broad leeway in prescribing the manner in which guns are carried. Accordingly, "the right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added).

Yet concealed carry bans are only "presumptively" constitutional. *Heller*, 554 U.S. at 627 n.26. As one court observed,

> [N]ot *all* concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it relied upon instruct that concealed

13

weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme.

*Peruta* v. *County of San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal. 2010) (emphasis in original).

Surveying the history of concealed carry prohibitions, it appears time and again that concealed carry prohibitions have been upheld as mere regulations of the manner in which arms are carried—with the understanding that a complete ban on the carrying of handguns is unconstitutional. The four state supreme court opinions discussed by *Heller* referenced this conditional rule.

Upholding a ban on the carrying of concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*State* v. *Reid*, 1 Ala. 612, 616-17 (1840).

Georgia's high court followed *Reid*, quashing an indictment for publicly carrying a pistol for failing to specify how the weapon was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn*, 1 Ga. at 251 (emphasis original).

*Andrews*, supra, presaged *Heller* by finding that a revolver was a protected arm under the state constitution's Second Amendment analog. It therefore struck down as unconstitutional the application of a ban on the carrying of weapons to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews*, 165 Tenn. at 187-88.[5]

> Finally, in *State* v. *Chandler*, 5 La. Ann. 489 (1850)*,*
>
> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *Chandler*, 5 La. Ann. at 490).

Other decisions reflected the rule allowing for concealed-carry prohibitions only as regulations on the manner of carrying guns. *See, e.g. State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (concealed carry prohibition "a measure of police, prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society") emphasis original) (citation omitted)); *Owen* v. *State*, 31 Ala. 387, 388 (1858) (concealed carry ban "a mere regulation of the manner in which certain weapons are to be borne").

---

[5]*Andrews* appeared to abrogate in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

For supporting the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (G. Chase ed. 1884), *Heller*, 554 U.S. at 626, which provides:

> [I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (emphasis original). This understanding survives today. *See, e.g. In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed").

Legislatures might well prefer one form of carrying over another. Precedent reveals an ancient suspicion of weapons concealment where social norms viewed the wearing of arms as virtuous. But today, openly carrying handguns may alarm individuals unaccustomed to firearms. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523 (2009); *cf. Gonzalez* v. *Vill. of W. Milwaukee*, 2010

U.S. Dist. LEXIS 46281 at *8-*9 (D. Wis. May 11, 2010) ("No reasonable person would dispute that walking into a retail store openly carrying a firearm is highly disruptive conduct which is virtually certain to create a disturbance").[6]

*Heller*'s recognition of a right to carry a handgun does not force states to allow the carrying of handguns in a manner that may cause needless public alarm, so long as a more socially-conducive option exists to allow people to exercise the right to bear arms. But once a legislature determines that only a particular manner of carrying will be permitted, that choice must be honored.

In sum, the right to keep and bear arms plainly applies outside the home. And there is no reason to suppose it should not, without more, apply in parks as well as any other public places. The Supreme Court did not offer much guidance as to how to identify those places that are particularly sensitive such that a fundamental right to the means of

---

[6]Although *Gonzalez* erred in its unexamined statement that the Second Amendment does not secure the bearing of arms, the case is nonetheless instructive as it probably described accurately the local community's modern sentiment regarding the open carrying of arms. Notably, Wisconsin just enacted a "shall issue" system for the issuance of concealed handgun carrying licenses. Wis. Stat. § 175.60.

self-defense may be abrogated within their bounds, but the mere presence of others would be an exception swallowing the entire rule. People, including children, are found almost everywhere—and regrettably, so is the crime against which people may arm themselves.

Indeed, hiking in some portions of the National Park System unarmed may be positively irresponsible. *See, e.g.* "Border Concerns," available at http://www.nps.gov/orpi/planyourvisit/boarder-concerns. htm (last visited December 5, 2011) (advising visitors to Arizona's Organ Pipe Cactus National Monument that the park lies in a "remote region" hosting drug-smuggling routes along the Mexican border, and notwithstanding advice to call 911 for emergencies, "cell phone service is usually out of range"). Responsible, law-abiding people may carry arms to secure their family's safety in parks—an obvious application of the Second Amendment right.

B.    *HELLER*'S INTERPRETATION OF "BEAR ARMS" BINDS THIS COURT.

The Supreme Court's definition of "bear arms" in *Heller* was not dictum. It is well established that

> When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound . . . the principle of *stare decisis* directs us to adhere

not only to the holdings of our prior cases, but also to their explications of the governing rules of law . . .

*Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 67 (1996) (citations and internal marks omitted); *Sanborn* v. *Parker*, 629 F.3d 554, 570 (6th Cir. 2010). Language "explain[ing] the court's rationale . . . is part of the holding." *United States* v. *Bloom*, 149 F.3d 649, 653 (7th Cir. 1998). In contrast,

> [a] dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.

*Sarnoff* v. *Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986); *Hormel Foods Corp.* v. *Jim Henson Prods.*, 73 F.3d 497, 508 (2d Cir. 1996). "[I]t is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case." *Baraket* v. *Holder*, 632 F.3d 56, 59 (2d Cir. 2011) (citation omitted).

Considering its need to address the District of Columbia's collectivist interpretation of "bear arms," the Court's conclusion that the right to "bear arms" is the right to "carry weapons in case of confrontation" was essential to *Heller*'s resolution. The question of what "bear arms"

means "was before the court; was argued before the court; and was passed upon by the court. It was not dictum." *Hormel*, 73 F.3d at 508 (citations and internal punctuation omitted). The numerous pages describing how that right applies outside the home confirm that the matter received the Court's exhaustive consideration.

Missing from the lower court's decision is any reasoning for *why Heller* must be limited to its facts. Or more critically, even if the Supreme Court's definition of "bear arms" is to be ignored as dicta, what other meaning might that constitutional text hold?

Until recently, opponents of the individual right to bear arms offered a militaristic, state-directed definition for "bear arms," but *Heller* dispensed with that option. *Amici* aver that the definition the Supreme Court offered comports with the Second Amendment's original public meaning, if it is not already binding as a matter of *stare decisis*.

II. WHILE THE SECOND AMENDMENT PROTECTS THE POSSESSION AND USE OF PLAINTIFF'S ARM, IT DOES NOT PROTECT PLAINTIFF'S DANGEROUS AND UNUSUAL USE OF HIS ARM.

As the District Court noted, this case does not raise the question of whether an AK-47 of the type carried by Plaintiff is an arm whose possession and use is protected by the Second Amendment. R. 43, at 17

n.5 ("parties did not submit proof" on "significant issue" of whether "Plaintiff's AK-47, Draco pistol model, although legal, is a weapon 'typically possessed by law-abiding citizens for lawful purposes.'") (citing *Heller*, 554 U.S. at 625).

*Amici* submit that civilian versions of the AK-47, fitted with ordinary 30 round magazines, would easily qualify as arms of the kind in common use and are thus protected by the Second Amendment (at least when their barrel tips are not painted orange to resemble toys). Americans today access these highly popular arms for various traditional lawful purposes to which they are well-suited.

But the Second Amendment question here cannot be resolved by reference to whether the *ordinary* use and possession of Plaintiff's arm is constitutionally protected. Assuming that it is, Plaintiffs' *conduct* with that firearm is not protected, and his Second Amendment claim fails specifically for that reason.

At this early date in the development of Second Amendment law, little consideration has been given to *Heller*'s reference to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citations omitted). Upon

closer examination, the "dangerous and unusual" doctrine is not merely a restatement of *Heller*'s common use test for protected arms. *Heller* offered that the common use test is "supported by" the prohibition on the carriage of dangerous and unusual weapons, *id.*, (and logically, this is correct), but that is not to say the two concepts—the scope of the arms protected by the Second Amendment, and the "dangerous and unusual" doctrine—are identical. They are not. The latter doctrine here bars Plaintiff's Second Amendment claim.

As the sources *Heller* cited indicate, the longstanding prohibition on the carrying of "dangerous and unusual weapons" does not, in fact, refer to types of weapons, but to types of *conduct* with weapons. A necessary element of this common law crime of affray, to which the "dangerous and unusual" prohibition refers, had always required that the arms be used or carried in such manner as to terrorize the population, rather than in the manner suitable for ordinary self-defense.

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the*

*land.*" 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. L. C. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[ ] act of violence or disturbance of the peace." 1 TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s subsequent sources for the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour*

*among the people.*" 3 James Wilson, WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people.*" John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also Heller*, 554 U.S. at 588 n.10 (quoting same).

"[T]here may be an affray . . . where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." 1 William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending

25

against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id.* at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English* v. *State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land").

As *Heller* summed up, the traditional right to arms "was not a right to keep and carry any weapon whatsoever in any manner whatsoever

and for whatever purpose." *Heller*, 554 U.S. at 626. A civilian AK-47

pistol might be an appropriate defensive arm under some

circumstances and in some places. But few *if any* Americans exercising

their right to bear arms would openly carry across their chest an AK-47

pistol—only half an inch shorter than a rifle—with a 30 round

"banana" magazine in an ordinary urban or suburban park to deal with

potential muggers.[7]

For purposes of constitutional analysis, not all parks are created

equal.  That much is acknowledged in the First Amendment context:

> Mount Rushmore does not become a public forum merely by being
> called a "national park" any more than it would be transformed into
> a nonpublic forum if it were labeled a "museum." The dispositive
> question is not what the forum is called, but what purpose it serves,
> either by tradition or specific designation.

*Boardley* v. *United States Dept. of Interior*, 615 F.3d 508, 514-15 (D.C.

Cir. 2010). It should seem equally obvious that not every portion of

every park would be an appropriate place to possess a handgun, let

_____

[7]Military-style rifles are also carried occasionally as a form of
symbolic speech. *Amici* take no views here regarding the extent of the
First Amendment's protection for displaying firearms. Plaintiff did not
assert any First Amendment rights supporting his conduct. Beyond
seeking to foment a lawsuit, it is unclear whether Plaintiff's conduct
was meant to communicate anything.

alone an AK-47, for self-defense. Nonetheless, barring extenuating circumstances, park-goers who object to law-abiding, responsible Americans carrying handguns for self-defense in an ordinary manner should accommodate themselves to the traditional right to bear arms enjoyed by their neighbors. The Constitution sets out certain rights for protection precisely because their exercise may prove offensive to some who would suppress them.

Yet even most ardent supporters of the right to bear arms would pause at the sight of a camouflaged man carrying a 30-round AK-47 across his chest at a nature preserve—especially an AK-47 modified to resemble a toy. This is, to say the least, not normal behavior, regardless of whether it is technically allowed by Tennessee law because the AK-47 at issue was eleven and half rather than twelve inches long. R. 16-1, at 71, l. 12-15.

Of course, even Plaintiff, who usually carries a handgun for self-defense, was not utilizing his gun for ordinary defensive purposes. Plaintiff carried his gun for the purpose of being arrested:

> I can't wait for a cop to arrest me because I open-carried a handgun and someone called 9-1-1. It almost happened twice but no cigar yet. Maybe carrying a PLR-16 or AK pistol will change that.

28

R. 16-1, p. 52, l. 2-18 and p. 109, Exh. 3.[8] Plaintiff anticipated that a ranger would discuss the AK-47 with him. R. 16-1, at 59, l. 12-14. While individuals carrying handguns for self-defense typically carry them in a holster, openly or concealed, Plaintiff was carrying his weapon on a sling both over his back and, at the time he came upon the officers, across his chest. R. 16-1, at 36, l. 21-24; 37, l. 25-38, l. 16; 42, l. 3-8; 61, l. 10-14.

Perhaps recognizing that his conduct might be seen as provocative, Plaintiff painted the barrel tip of the AK-47 orange to make it appear to be a toy, so that the police would not shoot him. "I painted the muzzle nut/thread protector blaze orange because I have safety in mind. It means no one can and will shoot me."  R. 16-1, at 49 [50], l. 2-6. "Cops don't shoot people with orange-tipped handguns. When they do, they think twice about it." *Id.* at l. 23-25. Plaintiff surmised that he would "probably generate fewer MWAG [man with a gun] calls" with the firearm disguised as a toy, R. 16-1, at 51, l. 2-15, but at least one park visitor was as confused as the ranger. R. 16-1, at 78, l. 22-25; 79, l. 16-

---

[8]Plaintiff admitted this internet post was made under his handle and "could be my words" but did not recall specifically typing them. *Id.*

21. The confusion was predictable. *See* 15 U.S.C. § 5001(b)(1) (requiring "a blaze orange plug inserted in the barrel of such toy, look-alike, or imitation firearm").

Plaintiff obviously sought to attract attention to an arm that was highly unusual under the circumstances, and which would not, at first glance, appear to be a handgun. Critically, Plaintiff does not challenge the prohibition on the carrying of a full-length AK-47 at Radnor Lake.

Plaintiff was carrying, as one would carry a rifle, a weapon of a type commonly thought of as a rifle, and with a barrel length within half an inch of legality—and then deliberately added the confusing aspect of an orange toy-colored barrel tip. His temporary investigative stop was plainly constitutional, as the police had ample reason to inquire further as to the firearm's legality.

But were Tennessee law to forbid the use of rifle-based handguns in areas where rifles could properly be restricted, and forbid the disguising of firearms as toys, *cf. United States* v. *Marzzarella*, 614 F.3d 85 (3d Cir. 2010) (Second Amendment does not protect carrying guns with obliterated serial numbers), it would not violate the Second Amendment.

Plaintiff naturally, and quite unnecessarily, terrified other park visitors in a manner plainly inconsistent with the traditional right to bear arms for self-defense. Unfortunately, he compounded the problem by filing a meritless lawsuit that generated an opinion jeopardizing the Second Amendment rights of law-abiding, responsible people.

CONCLUSION

The Supreme Court recognized both the right to bear arms for self-defense, and the traditional prohibition on affray. Preserving these fully consistent concepts, this Court should affirm the entry of judgment for Defendant-Appellee.

Dated: December 5, 2011     Respectfully submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax: 703.997.7665
alan@gurapossessky.com

By:   /s/ Alan Gura
      Alan Gura

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE
## TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,373 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura
Alan Gura
Counsel for Amici Curiae
Dated: December 5, 2011

## <u>CERTIFICATE OF SERVICE</u>

On this, the 5th day of December, 2011, I served the foregoing Amicus Curiae Brief by electronically filing it with the Court's CM/ECF system, which generated a Notice of Filing and effects service upon counsel for all parties in the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 5th day of December, 2011


/s/ Alan Gura_____
Alan Gura